**Richard F. MILLARD, Plaintiff,**

v.

**UNITED STATES of America, Defendant.**

**Civ. No. 3:CV–90–0309.**

United States District Court, M.D. Pennsylvania.

Oct. 23, 1992.

---

**23.** The amount of the addition is equal to 10% of any underpayment attributable to the under-statement.

Joseph Smukler, Meyer, Lasch, Hankin & Poul, Philadelphia, Pa., for plaintiff.

Frederick E. Martin, Asst. U.S. Atty., Lewisburg, Pa., for defendant.

## MEMORANDUM

McCLURE, District Judge.

### BACKGROUND

Plaintiff Richard F. Millard filed this action against the United States government under the Federal Tort Claims Act ("FTCA"), 28 U.S.C. §§ 2671–2680,[1] seeking damages for injuries to his back allegedly sustained on February 6, 1988 while he was unloading mail from a tractor-trailer truck docked at the Harrisburg, Pennsylvania post office.[2] At the time of the accident, Millard was employed as a truck driver by Lucas Trucking ("Lucas") of Jersey Shore, Pennsylvania.

Lucas had a contract with the United States Postal Service ("U.S.P.S.") to transport mail in bulk from Detroit to Philadelphia. Millard was assigned by Lucas to the Jersey Shore–Philadelphia leg of the route, which included a stop at the Harrisburg post office to unload and take on mail.

On Saturday, February 6, 1988,[3] Millard picked up his truck and trailer at Lucas's

---

**1.** Jurisdiction exists under 28 U.S.C. § 1346(b). The Postal Service made a final disposition of Millard's administrative tort claim on January 4, 1990. 28 U.S.C. § 2675(a).

The United States is the only proper defendant in an action filed under the Federal Tort Claims Act. 28 U.S.C. § 2679.

**2.** A claim was also asserted initially by Millard's wife, Cheryl Millard, for loss of consortium (Count II of plaintiff's complaint), but subsequently dropped because Cheryl Millard had not preserved her claim at the administrative level. 28 U.S.C. §§ 2675(a).

**3.** Millard's work week began Saturday and ended Wednesday. Thursday and Friday were his days off.

Jersey Shore terminal. The trailer was sealed when Millard picked it up, having been loaded by postal workers, or their agents, in Cleveland and Detroit and sealed by a postal service employee named R.W. Holmes in Cleveland. Cleveland was the last stop before Jersey Shore at which mail was loaded and unloaded. The trailer remained sealed until the seal was broken by a postal service employee at Harrisburg.

When Millard arrived at Harrisburg, his first stop on the run, he backed the trailer into the dock he was assigned (Dock No. 36) and began unloading it himself because no postal service employee was free to assist him. As he was doing so, he was struck in the back by one of the all purpose carriers or "APC's" which the postal service uses to transport mail. The impact knocked him to his knees. It took him a few minutes to regain his composure. After he did so, he called out to postal workers nearby for assistance, and with the assistance of a postal worker, finished unloading and loading the truck.

After telling a postal employee about the incident, Millard left for his next stop and completed his route. Millard experienced increasing back pain over the next several days, and left word for his wife to make a doctor's appointment for him.

On his next day off, Thursday February 11, 1988, he went to Dwight R. Miller, D.C., chiropractor, complaining of pain in his lower back radiating into his legs. Dr. Miller had plaintiff go to Jersey Shore Hospital for an x-ray of his lumbar spine.[4] Dr. Miller diagnosed the problem as back strain and had plaintiff return for a series of manipulations of his spine.[5]

While he was undergoing treatment with Dr. Miller, plaintiff was also attending physical therapy sessions at Divine Providence Hospital in Williamsport, Pennsylvania, under the supervision of Dr. Midmore. He attended sessions regularly for one month.

In mid-March, 1988, plaintiff's condition worsened and he consulted Dr. Hani Tuffaha, a neurosurgeon with offices in Williamsport, Pennsylvania. Dr. Tuffaha had plaintiff undergo an MRI[6] from which Dr. Tuffaha concluded that he had a herniated disc at the L-5/S-1 level requiring surgical intervention.[7] On April 7, 1988, Dr. Tuffaha performed a L-5/S-1 laminectomy[8] and a discectomy to correct the problem. Dr. Tuffaha tracked plaintiff's post-operative progress over the next several months, and observed that he appeared to be recovering well from the surgery. In July of 1988, plaintiff's condition took a turn for the worse after he slipped and fell on wet grass. Dr. Tuffaha had him undergo a second MRI, which revealed that he had a fractured facet and a herniated disc at the L-4/L-5 level. Dr. Tuffaha performed back surgery on plaintiff in August 25, 1988 to correct that condition.

Unfortunately, plaintiff's condition did not improve and he remained unable to work. In December, 1988, he underwent another MRI which revealed nothing abnormal about the condition of his spine.

On July 5, 1989, plaintiff was examined by Dr. Maurice Romy, a neurosurgeon, with offices in Philadelphia, Pennsylvania, who found him profoundly disabled and recommended that he undergo further treatment.

**4.** The human spinal column is made up of five sets of vertebrae, which are made up of seven cervical vertebrae, twelve thoracic, five lumbar, five sacral, and four caudal vertebrae. *The Random House Dictionary of the English Language* 1838 (2d ed. 1987).

**5.** Dr. Miller's records were filed as trial exhibits P-7A.

**6.** MRI is the acronym for a "magnetic resonance imaging: a noninvasive diagnostic procedure employing an MR scanner to obtain detailed sectional images of the internal structure

of the body." *The Random House Dictionary of the English Language* 1259 (2d ed. 1987).

**7.** Discs are referred to by the names of the vertebrae immediately above and below them. The L-5/S-1 disc is located about waist level.

**8.** Laminectomy refers to the "surgical removal of part of the posterior arch of a vertebra to provide access to the spinal canal, as for the excision of a ruptured disc." *The Random House Dictionary of the English Language* 1078 (2d ed. 1987).

One month later, in August, 1989, plaintiff went to the Sister Kenny Institute in Minnesota for an examination which revealed that his condition had deteriorated substantially since his examination by Dr. Romy one month earlier. His physicians there recommended decompressive surgery at L4–5 and L5–S1 with two level 360 degree interbody lumbar fusions. Plaintiff agreed to undergo the recommended procedure, and the surgery was performed by a team of three surgeons on April 17, 1990. Due to complications following that operation, plaintiff had to undergo further surgery involving a disc aspiration at the L4–5 level on September 19, 1990 at the Sister Kenny Institute. Plaintiff underwent yet another surgical procedure at the Sister Kenny Institute on June 25, 1991 for the removal of a posterior segmental instrumentation and repair of a pseudoarthrosis L4 by sacrum by a posterolateral fusion using iliac bone. On July 1, 1991, plaintiff underwent another operation at the Sister Kenny Institute for the repair of his abdominal wall necessitated by one of this prior back surgeries.

The multiple back surgeries and the various complications have left plaintiff totally disabled. He has not worked since February 10, 1988. He walks with difficulty and is in severe to moderate pain much of the time. The physicians who have examined him or reviewed his records agree that he is a victim of failed back syndrome, meaning that his recovery has not been what would have been anticipated, that he is not a good candidate for any further surgery, and that is there is essentially nothing that can be done to improve his condition.

Plaintiff filed this action against the United States alleging that the negligence of the U.S.P.S. is responsible for his current condition. Plaintiff alleges that: (1) postal workers' negligence, either in failing to set the brake on the APC or in failing to red-tag it if the brake was defective, is responsible for the APC striking him on February 6, 1988; (2) that accident caused him to suffer a herniated disc at the L–5/S–1 level; and (3) that herniated disc and complications from the procedures which he had to undergo to have it corrected have left him profoundly disabled, rendering the United States liable for all damages caused by the chronic back problems he has experienced since February 6, 1988. Plaintiff seeks to recover (1) the medical expenses incurred for treatments and surgery on his back and for the treatment of a pre-existing psoriasis condition which was allegedly exacerbated by the stress caused by his back injuries; (2) past and future lost wages as a truck driver; and (3) compensation for pain and suffering.

The United States disputes both negligence and causation. It argues that plaintiff has failed to prove negligence on the part of postal workers or agents of the Postal Service and has failed to carry his burden of proving by a preponderance of the evidence that his herniated disc was caused by the February 6, 1988 accident. Defendant argues that plaintiff has failed to refute expert testimony that there is no causal link between the accident and plaintiff's herniated disc diagnosed March 23, 1988 or any of the problems from which he suffered thereafter.

A non-jury trial was held March 16, 17 and 18, 1992. The fact witnesses who testified on plaintiff's behalf included the plaintiff, his wife, and several former co-workers of plaintiff's from Lucas Trucking. Dr. Maurice Romy testified by videotape deposition [9] as plaintiff's medical expert on the issues of causation and medical expenses. Richard Millard was plaintiff's sole rebuttal witness.

The defendant called as fact witnesses Ray Kerwin, the Expeditor on duty at the Harrisburg Post Office the day of plaintiff's accident; Charles Daley, a Postal Service supervisor, Dorothy Musheno, the Manager of Safety and Health for the Harrisburg division of the Postal Service; and Brian Shellhaese, an Inspector for the Postal Service. Dr. Sandra Shuman testified by

---

**9.** The videotape of Dr. Romy's deposition, which was taken February 19, 1992, was filed as trial exhibit P–34a The transcript of the deposition was filed as trial exhibit P–34.

videotape deposition [10] as defendant's medical expert. Defendant did not present any surrebuttal testimony.

Upon conclusion of the testimony, the court allowed additional time for the submission of supplemental proposed findings of fact.

Based on the evidence presented at trial we find that: (1) Postal Service employees or Postal Service agents were negligent in failing either to red tag, or to set the brake, on the APC which struck plaintiff on February 6, 1988; (2) plaintiff sustained a lumbosacral sprain or strain as a result of the February 6, 1988 accident, a condition which did not require surgery and from which he substantially recovered one month after the accident; and (3) plaintiff has not established by a preponderance of the evidence that the herniated disc [11] at the L5/S-1 level diagnosed by Dr. Tuffaha based on the March 23, 1988 MRI, and for which surgery was performed on April 6, 1988, was caused by the February 6, 1988 accident with the APC.[12]

Plaintiff is, therefore, entitled to recover only the medical expenses and lost wages incurred in connection with the lumbosacral sprain and the one-month recovery period it required, as well as the pain and suffering associated with that injury. Plaintiff will be awarded medical expenses of $3,042.35, $3,303.08 in lost wages (calculated as $825.77 × 4 weeks) and $2,500.00 for pain and suffering, for a total of $8,845.43.

*Findings of Fact*

Based on the evidence introduced at trial, we make the following findings of fact:

1. Plaintiff Richard J. Millard was born March 9, 1938. He was forty nine years-of-age on February 6, 1988.

2. On Saturday, February 6, 1988, plaintiff was employed by Lucas Trucking, Inc. as a truck driver.

3. Lucas contracted with the United States Postal Service to transport United States mail in bulk.

4. Millard was assigned the Jersey Shore–Philadelphia route. It was his job to pick up a trailer loaded with United States mail at Lucas' Jersey Shore, Pennsylvania terminal, stop at the Postal Center at Harrisburg to unload and take on mail, drive to Philadelphia's Thirtieth Street Station, unload the mail there, make another stop at Langhorne, Pennsylvania, then return to Jersey Shore. Millard drove this route three times a week from Saturday through Wednesday.

5. February 6, 1988 was a Saturday, the start of Millard's work week.

6. On that date, he picked up a sealed trailer at Lucas' Jersey Shore terminal, and drove to Harrisburg, his first stop on the route. The trailer was sealed by a Postal Service employee named R.W. Holmes in Cleveland and had begun its journey in Detroit, Michigan with a stop-over in Cleveland to unload and take on mail.

7. When Millard picked up the trailer in Jersey Shore, it had on board 23 all-purpose carriers or "APC's". The U.S.P.S. uses APC's to transport mail in bulk. An APC is a wheeled cart 42″ long; 29″ wide; and 69″ high. APC's have a horizontal bar or handle on the side which protrudes one inch from the cart's lateral surface and is approximately 41 and ½ and 43 and ½ inches off the ground. Unloaded, an APC weighs 235 pounds. A fully-loaded APC weighs about 1500 pounds.

---

10. The videotape of Dr. Shuman's March 2, 1992 deposition was filed as trial exhibit D–33b. Dr. Shuman's deposition was not transcribed. Dr. Shuman's report dated December 2, 1991 was introduced at trial as D–33A.

11. Vertebral discs are made up of two components: a middle portion or nucleus consisting of a jelly-like substance and an outer ring called an annulus which keeps the jelly-like substance in place. What occurs when a disc herniates is that the disc develops a tear or rupture in the annulus, allowing the nucleus to migrate into the annulus and herniate into the spinal canal or the nerve roots. See: Transcript of videotape deposition of Dr. Romy, trial exhibit P–34, pp. 30–31.

12. Defendant's motion for leave to amend its answer (Record Document No. 41, March 18, 1992) to add a defense asserting that plaintiff's claims are barred by the statutory employer defense under Pennsylvania Workman's Compensation Law, 77 Pa.Stat.Ann. § 852, has been withdrawn.

8. APC's are equipped with a foot-activated caster brake. Postal regulations require that the brake be set at all times when the APC is in transit aboard a tractor-trailer truck. Postal regulations also require that the load-bar, a bar placed across the back of the trailer which prevents the load from shifting against the doors during transit be in place before the trailer doors are closed and sealed in preparation for transport.

9. Upon arrival at the Postal Service Center in Harrisburg, Millard backed the trailer into the loading dock assigned to him, Dock No. 36. Six APC's were to be unloaded from Millard's trailer at Harrisburg and several others taken on.

10. Dock No. 36 is on a slight incline such that the front end of a trailer docked there is slightly higher than the back.

11. After docking his trailer, Millard informed a postal employee of his arrival and waited for a Postal Service employee known as an Expeditor to break the seal on the trailer.

12. At the Harrisburg Post Office, Lucas drivers customarily assisted with the loading and unloading of trailers even though Lucas' contract with the U.S.P.S. specified that the route was not a "job assist" one, meaning that drivers were not required to assist with loading or unloading the mail. Lucas drivers assisted with loading and unloading with the knowledge and acquiescence of Postal Service employees.

13. After the seal on his trailer was broken, Millard looked around, and seeing no postal workers free to assist with loading and unloading, began the task by himself.

14. The six APC's to be dropped off at the Harrisburg Post Office were all fully loaded. As plaintiff was unloading the APC's he came upon one with a broken wheel, which made it difficult to move. He got behind that APC, finding it easier to push than to pull, and began pushing it off of the trailer, bending over slightly so that his body weight was against the APC.

15. While he was so engaged, another APC rolled toward him, without warning, striking him in the back at waist level, and knocking him to his knees. It took him several minutes to regain his composure and stand upright.

16. After he recovered from the impact, he called out to postal employees for assistance in finishing the unloading and loading. Plaintiff continued pushing APC's off of the trailer. At some point while he was working, a Postal Service employee came to help him finish the job.

17. Before departing for his next stop on the route, plaintiff informed the Expeditor on duty, Ray Kerwin, of the incident with APC. Kerwin did not file a report on the incident.

18. The APC which struck plaintiff would not have rolled forward if the brake were working properly and had been set before the truck left the stop where it was loaded. A Postal Service employee or U.S.P.S. agent was responsible for loading the APC onto the truck and ensuring that the brake was set or, if it was defective, for red-tagging it to alert others coming in contact with it of the defect. U.S.P.S. regulations require defective APC's to be marked with a red tag so that they can be sidelined for repairs at the first opportunity.

19. The APC which struck plaintiff did not have a red tag.

20. When plaintiff's truck was loaded, the Expeditor sealed the trailer, and plaintiff continued on his route, going next to Philadelphia, then to Langhorne, then returning to Jersey Shore.

21. Plaintiff experienced back pain as the trip wore on, which pain continued over the next several days.

22. Plaintiff completed his work week, completing two more Jersey Shore–Philadelphia runs. Millard felt he had an obligation to his employer to finish his work week even though he was in pain. Between trips, he left word for his wife to make an appointment with a chiropractor, Dr. Miller.

*Medical treatment*

23. At the end of the work week, on February 11, 1988, Millard had an appoint-

ment with Dr. Miller. Dr. Miller referred him to the Jersey Shore Hospital for an x-ray of his spine.

24. The 2/11/88 x-ray of plaintiff's lumbar spine revealed no abnormality. A herniated disc would not, however, be revealed by an x-ray.

25. Millard went to the Emergency Room at Divine Providence Hospital in Williamsport, Pennsylvania on 2/14/88 because he was experiencing severe flu-like symptoms. Hospital records on that visit indicate that Millard reported pain in both legs and complained of having cold symptoms and fever including chills beginning on 2/11/88. The diagnosis was that he was suffering from a febrile illness and viral syndrome.

26. Millard had a return appointment at Divine Providence on 2/16/88, during which he reported that, although his back pain and fever improved, he still experienced headaches and pain on the right side of his neck. He had another follow-up appointment at Divine Providence on 2/19/88, during which his back was again examined. No diagnosis of a back problem was made at that time.

27. Millard saw Dr. Miller again on 2/12, 2/18, 2/22, 2/25, 3/3, 3/4, 3/7, 3/8, 3/11, 3/14, 3/15, and 3/17 1988. At most appointments, Dr. Miller manipulated his spine.

28. Dr. Miller's office notes on those visits reveal that Millard reported the following to Dr. Miller:

(a) On 2/11/88, Millard described the February 6, 1988 accident with the APC and reported that he was experiencing lower back pain and tightness in his lower back in certain positions.

(b) On 2/12/88, Millard reported, in Dr. Miller's words, "marked relief of pain" in his back the previous evening from the application of ice. He also reported that he had seen Dr. Wasilewski the day before for his psoriasis and that he had diagnosed him as suffering from a kidney bruise after noting the presence of blood in his urine.

(c) On 2/18/88, Millard reported suffering from nausea and sweating on 2/14/88 which caused him to go to the Emergency Room at Divine Providence Hospital that date.

(d) On 2/22/88, Millard reported that he was still experiencing pain in the right cervical spine area and lower back pain.

(e) On 2/25/88, Millard reported that he continued to experience pain in the gluteal,[13] posterior thigh region and lumbar spine and that he experienced such pain about 90% of the time. He described the pain as dull and nagging, not sharp.

(f) On 2/29/88, Millard reported that he continued to experience aches in the left gluteal, posterior upper thigh regions, but did not complain of lower back/lumbar pain.

(g) On 3/1/88, Millard continued to complain of aching in the left gluteal, posterior upper thigh regions. Dr. Miller noted that he was experiencing sciatica[14] as well.

(h) On 3/3/88, Millard again reported left gluteal pain.

(i) On 3/4/88, Millard continued to complain of constant lower back pain, and intermittent upper gluteal, anterior thigh pain. He also complained of ankle discomfort.

(j) On 3/7/88, Millard reported some remaining upper posterior gluteal ischial[15] aching. Dr. Miller noted that he was in all

---

13. Gluteal refers to the muscles of the buttocks or the buttocks. *The Random House Dictionary of the English Language* 814 (2d ed. 1987).

14. Sciatica refers specifically to pain and tenderness at some point or points along the sciatic nerve, and in a more general sense, to "any painful disorder extending from the hip down the back of the thigh and surrounding area". *The Random House Dictionary of the English Language* 1716 (2d ed. 1987).

The sciatic nerves are a pair of nerves that originate in the "lower back, and extend down the buttocks to the back of the knees, where they divide into other nerves: the sciatic nerve and its branches innervate large areas of the pelvis, leg and foot." *Id.*

15. Ischial is an adjective which refers to "either of the bones on which the body rests when sitting." *The Random House Dictionary of the English Language* 1010 (2d ed. 1987).

other respects asymptomatic since his last visit.

(k) On 3/8/88, Millard reported residual gluteal aching but no ischial complaints. Dr. Miller noted that he was also experiencing upper posterior lateral gluteal pain.

(l) On 3/11/88, Millard reported that he had seen Dr. Tuffaha, a neurosurgeon on March 10, 1988 who had advised him that he was still unable to return to work. Millard reported a marked decrease in gluteal and ischial complaints since his last visit with Dr. Miller.

(m) On 3/14/88, Millard reported complete relief of all pain on the afternoon and evening of March 11, 1988, the date of his last visit with Dr. Miller. He also reported the gradual return of left posterior lateral upper gluteal pain from 3/12/88 to 3/14/88. Dr. Miller noted that plaintiff also complained of occasional sharp shooting pain in his left lower extremity.

(n) On 3/15/88, Millard complained of left upper gluteal, left lateral thigh and toe cramping. He reported no lower extremity pain, just stiffness. He also reported the presence of pain in his upper posterior, lateral gluteal area. He reported no lower extremity paresthesia.[16] Dr. Miller found his heel to toe walking normal.

(o) On 3/17/88, Dr. Miller noted no weakness on heel or toe walking. Millard reported experiencing constant left 4th and 5th toe paresthesia. He reported as well constant left gluteal pain, but minimal lower extremity pain. The 3/17/88 visit was Millard's last with Dr. Miller.

*Herniated disc symptomatology*

29. Millard's principal complaints during the month he saw Dr. Miller immediately after the February 6, 1988 accident were low back pain, neck pain and dizziness. These complaints are not consistent with the symptoms indicative of a herniated disc at the L–5/S–1 or the L–4/L–5 level.

30. The symptoms associated with a herniated disc at the L–5/S–1 or the L–4/L–5 level depend on the course that the herniation takes, i.e. whether it is a lateral or a mid-line herniation.

31. A mid-line disc herniation at the L–5/S–1 level can be asymptomatic or so nearly symptom-free that the patient is unaware of a problem.

32. A lateral disc herniation at the L–5/S–1 level is associated with pain in the lower extremities, frequently the heel, perhaps accompanied by numbness or weakness in the affected leg. These symptoms are caused by compression of the nerve root leading to that part of the body. Pain in the lower extremity served by the compressed nerve root would be the predominant complaint.

33. The complaints which plaintiff voiced to Dr. Miller during his visits in February, 1988 and prior to March 14, 1988 are not consistent with what a patient with a herniated disc at the L–5/S–1 or the L–4/L–5 level would experience.

34. The complaints and symptoms which plaintiff reported to medical care providers at Divine Providence Hospital during his visits there in February, 1988 and prior to March 14, 1988 are not consistent with what a patient with a herniated disc at the L–5/S–1 or the L–4/L–5 level would experience.

35. A herniated disc can be caused by any number of factors. The cause need not be an obvious or violent injury such as a fall or a blow, but can be a subtle one such as a cough, a sneeze or a sudden movement in the wrong direction. The possibility of a herniated disc resulting from a subtle cause becomes more likely as individuals age. Because the cause can be subtle, an individual may be unaware that he has suffered a herniated disc until he begins to experience symptoms, making it difficult to identify the cause.

36. Plaintiff has not established a causal link between the herniated disc, for which he underwent surgery by Dr. Tuffaha in April, 1988, and the February 6, 1988 accident involving the APC.

---

**16.** Paresthesia refers to "an abnormal sensation" such as "prickling, itching, etc." *The Random House Dictionary of the English Language* 1410 (2d ed. 1987).

37. The first symptoms consistent with a diagnosis of herniated disc at the L–5/S–1 level did not surface until between March 12 and March 14, 1988. During his March 14, 1988 visit with Dr. Miller, Millard complained of occasional sharp shooting pain in his left lower extremity and reported toe cramping.

38. Millard reported further symptoms consistent with a diagnosis of herniated disc at the L–5/S–1 level during his next visit on March 17, 1988. During that visit, Dr. Miller noted that Millard reported constant left 4th and 5th toe paresthesia.

39. Approximately one week to ten days later, Millard consulted Dr. Tuffaha who had him undergo an MRI on March 23, 1988, which resulted in the diagnosis of his herniated disc.

*Lumbosacral sprain*

40. The symptoms of lumbosacral sprain are pain in the lower back sometimes radiating into the upper thighs.

41. The complaints which plaintiff voiced to Dr. Miller during his visits in February 1988 consisted principally of bilateral low back pain radiating into his buttocks and upper thighs. These are complaints consistent with a diagnosis of lumbosacral sprain or strain.

42. Lumbosacral sprain is a muscle condition treated conservatively through physical therapy and rest. Surgery is not an appropriate course of treatment.

43. Plaintiff suffered a lumbosacral strain as a result of the February 6, 1988 accident with the APC from which he had substantially recovered by early March, 1988 through treatment with Dr. Miller and physical therapy at Divine Providence.

44. Millard was making a good recovery under the treatment of Dr. Miller from lumbosacral strain which he suffered on February 6, 1988 and would have fully recovered from that condition without the need for surgery.

*Back injury of September 25, 1987*

45. Millard had injured his back previously on the job. On September 25, 1987, he suffered a lumbosacral strain while lifting a dock plate [17] at the Harrisburg Mail Center. Millard saw Dr. Miller three days after the incident and continued a course of treatment with him over the next month. He recovered well from that injury following a month of conservative treatment with Dr. Miller. No surgery was required.

46. The symptoms which Millard reported to Dr. Miller following the September 25, 1987 injury are identical to those which he reported to Dr. Miller during his February, 1988 appointments.

47. There is no causal connection between the injury plaintiff sustained in September, 1987 and the injury which he sustained February 6, 1988 or the herniated disc diagnosed March 23, 1988.

48. The back injury which plaintiff sustained at work on September 27, 1987 had no bearing on his subsequent February 6, 1988 injury. Plaintiff had fully recovered from the prior injury by the end of October, 1987 at the latest.

*Psoriasis*

49. Millard has suffered from psoriasis since the age of 18. His condition improved after 1980 when he began taking methotrexate under the supervision of Dr. Wasilewski. While he was taking methotrexate, Millard underwent periodic blood testing to determine whether the methotrexate was affecting his liver. Millard had to cease taking methotrexate after his back problems became severe because of the possibility that it would affect or interfere with the course of treatment for his back condition.

50. As a consequence, his psoriasis worsened. This, however, did not occur during the period he was undergoing treatment for the lumbosacral strain. He did not cease taking methotrexate until some time later, meaning that there is no causal connection between the injury which he

---

17. A dock plate is a metal ramp-placed between the trailer and the edge of the dock so that APC's can be rolled off of and onto the truck.

suffered February 6, 1988 and the worsening of his psoriasis.

*Damages*

51. Plaintiff was unable to work for four weeks as a result of the lumbosacral strain. At that time, he was earning $825.77 per week.[18] He is, therefore, entitled to recover lost wages of $3,303.08 (calculated as $825.77 per week × 4 weeks).

52. Plaintiff incurred medical bills totaling $3,042.35 for treatment of lumbosacral strain by Dr. Midmore and other care providers at Divine Providence Hospital, Dr. Miller, and others.[19]

53. Plaintiff is entitled to damages in the amount of $2,500.00 as compensation for pain and suffering during the four weeks he was bothered by the lumbosacral strain.

54. Plaintiff is entitled to total damages of $8,845.43.

DISCUSSION

*Pennsylvania law*

■ Under the FTCA, the state law that would apply to determine the liability of "a private individual under like circumstances" applies to determine the liability of the government. *Rodriguez v. United States,* 823 F.2d 735, 739 (3d Cir.1987), citing 28 U.S.C. § 2674. Here, Pennsylvania common law determines the duty which

the government, as the owner of the APC, owed to Millard.

Pennsylvania follows *Restatement (Second) of Torts,* §§ 388 and 392. The two sections impose differing standards of care of the owner of personalty responsible for causing an injury. Section 388 imposes a lesser standard of care on the supplier.[20] Under it, the supplier is "liable only if he 'knows or has reason to know that the chattel is or is likely to be dangerous for the use for which it is supplied' and fails to so warn the user." *Lambert v. Pittsburgh Bridge and Iron Works,* 463 Pa. 237, 344 A.2d 810, 811 (1975). By contrast, under section 392,[21] "the duty is clearly upon the supplier of the chattel and the user will be barred from recovery only if, knowing of the dangerous condition, he fails to take adequate precautions to protect himself."

■ Section 388 applies here. The APC was supplied by the government for use in delivering the mail, and Millard was furthering the interests of the U.S.P.S. by unloading the mail from his truck. He was, therefore, owed a high duty of care. See generally: *Lonsdale v. Joseph Horne Co.,* 403 Pa.Super. 12, 587 A.2d 810, 813 n. 2, *appeal denied,* 528 Pa. 637, 598 A.2d 994 (1991) (Business invitees are owed the highest degree of care).

---

**18.** This figure is derived from plaintiff's payslips for early 1988 (Trial exhibit P–29) which reflect gross earnings of $1651.53. Plaintiff was paid bi-weekly.

**19.** Attached as Appendix "A" is a breakdown of the medical costs included in the award.

**20.** Section 388 provides:

One who supplies directly or through a third person a chattel for another to use is subject to liability to those whom the supplier should expect to use the chattel with the consent of the other or to be endangered by its probable use, for physical harm caused by the use of the chattel in the manner for which and by a person for whose use it is supplied, if the supplier
(a) knows or has reason to know that the chattel is or is likely to be dangerous for the use for which it is supplied, and
(b) has no reason to believe that those for whose use the chattel is supplied will realize its dangerous condition, and

(c) fails to exercise reasonable care to inform them of its dangerous condition or of the facts which make it likely to be dangerous.
*Restatement (Second) of Torts,* § 388.

**21.** Section 392 provides:

One who supplies to another, directly or through a third person, a chattel to be used for the supplier's business purposes is subject to liability to those for whose use the chattel is supplied, or to those whom he should expect to be endangered by its probable use, for physical harm caused by the use of the chattel in the manner for which and by person for whose use the chattel is supplied
(a) if the supplier fails to exercise reasonable care to make the chattel safe for the use for which it is supplied, or
(b) if he fails to exercise reasonable care to discover its dangerous condition or character, and to inform those whom he should expect to use it.
*Restatement (Second) of Torts,* § 392.

The facts clearly establish that the duty owed Millard was breached. Postal Service employees or agents of the Postal Service either failed to set the brake on the APC which struck plaintiff or negligently failed to take note of the fact that it had a defective brake and red-tag it. Whatever scenario occurred, the United States is liable for the injury which resulted.

*Medical testimony*

As discussed above, plaintiff contends he suffered a herniated disc as a result of being struck by the APC. Defendant posits a different scenario. It is defendant's theory that the back problems which plaintiff experienced in February and early March, 1988 were caused by lumbosacral strain, not a herniated disc. Defendant argues that the symptoms which plaintiff exhibited during the five to six week period immediately following the accident are inconsistent with a herniated disc diagnosis because plaintiff did not exhibit any symptoms typically associated with that condition following the accident. It was not until approximately March 14, 1988, some five weeks after the accident, defendant contends, that plaintiff began to exhibit symptoms indicative of a herniated disc. Defendant further contends that plaintiff had substantially, if not fully, recovered from the lumbosacral sprain by early March, 1988 and would not have required surgery of any type for that condition.

Both parties presented expert medical testimony in support of their competing theories. Dr. Romy, a neurosurgeon, testified on plaintiff's behalf. Dr. Shuman, a neurologist affiliated with the University of Pennsylvania, testified on defendant's behalf. Both are well-qualified to testify on the subject of vertebral/spinal injuries.

Both sides agree that the March 23, 1988 MRI ordered by Dr. Tuffaha established as of that date that plaintiff had a herniated disc at the L–5/S–1 level. The key question is whether there is evidence that plaintiff had that condition during the weeks following the February 6th accident, i.e. whether there is evidence that the accident caused the injury.

Of the two physicians, only Dr. Shuman linked her diagnosis and causation theory to the physical symptoms which plaintiff exhibited during the five to six-week post-accident period. Dr. Shuman based her diagnosis on the symptoms and complaints which plaintiff voiced to his chiropractor, Dr. Miller. Dr. Miller's office notes give a running account of plaintiff's condition during the five to six weeks immediately following the accident; plaintiff saw Dr. Miller several times a week throughout the period.[22]

Over that period, plaintiff reported at various times that he was bothered by lower back pain, pain in the gluteal, posterior thigh region.[23] All of these symptoms point, according to Dr. Shuman, to lumbosacral sprain.[24] None, she states, are consistent with Dr. Romy's herniated disc diagnosis.

Dr. Shuman testified that a patient suffering from an L–5/S–1 level herniated disc would complain of loss of feeling in his lower extremities, shooting pains in his legs and feet, tingling sensations in his feet and toes. Lower back discomfort would be minimal or nonexistent, she explained, because the compression of the nerve root causes discomfort, loss of feeling, etc. at the nerve terminus,[25] which is in the case

---

22. As noted above, plaintiff was simultaneously undergoing physical therapy under the supervision of Dr. Midmore at Divine Providence Hospital. With the exception of notes concerning plaintiff's visit to the Emergency Room there on February 14, 1988 for flu-like symptoms, Hospital records provide little in the way of detailed recording of symptoms, pain, etc. reported by plaintiff over the period.

23. See Findings of Fact 26–27, p. 675 *supra.*

24. We have not given a verbatim recitation of Dr. Shuman's testimony or a page reference, because no transcript of Dr. Shuman's videotape deposition was filed with the court, and the trial testimony has not been transcribed.

25. The terminus of the L–5/S–1 nerve root is in the foot, specifically the toes.

of the L–5/S–1 disc, the foot, not at the nerve root in the back.[26] Plaintiff reported no discomfort or problems with his feet or lower extremities until his March 14, 1988 appointment with Dr. Miller. That was the first occasion on which he reported experiencing cramping in his toes.[27] During that same appointment plaintiff complained of occasional sharp shooting pain in his left lower leg. This was, in Dr. Shuman's opinion, the onset of herniated disc symptoms and indicates that plaintiff suffered a herniated disc just prior to that date due to some unidentified event. She further explains that it is not at all unusual that plaintiff reported no significant event causing that injury and is, apparently to this day, unaware of any event that precipitated the herniated disc. She testified that a herniated disc can be caused by a sneeze, a cough, in fact by any number of seemingly non-traumatic movements that people make every day and that it need not be caused by a traumatic event, such as a fall or a blow.

Dr. Shuman's diagnosis is supported by careful reasoning and by a logical process of matching the symptoms plaintiff reported with those typically associated with the particular condition. Dr. Romy's conclusion, on the other hand, is unsupported by any analysis of equal precision. The underpinning of Dr. Romy's opinion was, essentially, a "but for" type rationale. Dr. Romy explained the basis for his opinion, in response to questions by defendant's counsel:[28]

Q. And your conclusion [as to causation] is based upon what factors? Is it the medical records or what factors that brought you. to this conclusion?

A. The combination of the medical facts and the history.

Q. Now the history is the history that—that Mr. Millard gave you; is that correct?

A. Mr. Millard and the other physician.

Q. The other physicians being who?

A. Dr. Tuffaha, Dr. Burton, Dr. Salib, you name it.

. . . .

Q. So that based upon the location of the surgery and his complaints, that is why you believe the cart caused the injury?

A. And also the actual physical signs nerve root compression, of numbness of the legs which goes along with the herniated disc, which goes along with the surgery, and which goes along with the accident.

Now, this is actually how medicine does the correlation, by having the history correlating with clinical observation, the clinical evaluation, the radiological studies demonstrating a lumbar herniation which correlates with the previous element that I gave, and the subsequent events where the surgeon encounters a herniated disc at surgery, and that the whole condition makes clinical sense.

Q. Can we agree that the first objective finding of a disc herniation would have been in March of 1988 when the—I

---

26. There is, of course, the possibility that the February 6th accident caused *both* a herniated disc and a lumbosacral sprain, and that both diagnoses are correct. We discount that possibility, however, because for the reasons explained above, we find no evidence that plaintiff had a herniated disc prior to March 14, 1988.

27. There is a nonspecific reference in Dr. Miller's notes for the March 4, 1988 visit of ankle discomfort, but it does not resemble closely enough the herniated disc symptoms which Dr. Shuman described to be considered an indication of the onset of herniated disc symptoms.

28. The explanation given on direct examination is equally, if not more, inexplicit. Dr. Romy testified:

Q. And your diagnosis relative to the two herniated discs at L–4/5 and L–5/S–1 that you've given, do you have an opinion based on reasonable medical certainty as to the cause of these herniated discs?
A. Yes, I do.
Q. And what is that opinion?
A. Actually he didn't have any significant spinal condition prior to that. At the time of the injury, there has been an injury to the back which was susceptible to bring (sic) a herniated disc, and thereafter, two herniated discs were found.
(Transcript of videotape deposition, trial exhibit P–34, pp. 31–32.)

believe an MRI or some other examination was—had taken place.

A. That's correct.

(Transcript of videotape deposition, trial exhibit P-34, pp. 90–92)

Dr. Romy's reliance on symptoms reported immediately preceding the March 23, 1988 MRI is unavailing,[29] since as we have stated, the issue is whether there is evidence that plaintiff had the herniated disc immediately following and as a result of the February 6th accident. There is no question that he had a herniated disc by mid-March, 1988; the question is whether there is evidence which causally links that condition to the February 6th accident.

Although Dr. Romy explained the delay in the onset of typical herniated disc symptoms, we remain unpersuaded that his opinion is correct. Again, he did not link the symptoms plaintiff exhibited to the condition diagnosed and did not offer any explanation supporting his theory that plaintiff suffered from a biphasic, as opposed to a monophasic, herniated disc.[30] The terms biphasic and monophasic refer to the possible stages of herniation. Herniation can occur in one stage or two. If the rupture or tear in the annulus[31] and the extrusion of the nucleus into the annulus occur simultaneously, the herniation is monophasic, i.e. it occurs in one stage. If the annulus tears, but the nucleus does not migrate into it until some time later, the herniation is biphasic, i.e. it occurs in two stages.

While Dr. Romy posits a plausible theory, we are again troubled by the absence of any testimony from him linking his diagnosis to the facts of the case. Dr. Romy gives no reasons and no analysis, but instead again bases his conclusion on a but

for analysis. His reasoning is circular. He reasons that since the onset of plaintiff's symptoms were delayed, by approximately five to six weeks under his theory, plaintiff must have suffered a biphasic herniation. The fact that Dr. Romy examined the plaintiff twice and Dr. Shuman did not examine him at all bears no weight in our assessment. We agree with Dr. Shuman's view that examining the plaintiff one year, or more, after the accident, particularly after he had undergone several disc surgeries, does not aid in determining what injury he suffered as a result of the February 6, 1988 accident. The best evidence of his condition immediately post-accident are the records of Dr. Miller, and it is those records on which Dr. Shuman based her opinion.

Finally, we note that although both physicians are obviously very knowledgeable on the subject of disc/vertebrae conditions, it is our impression, from the doctors' descriptions of their experience and their current medical practices, that Dr. Shuman devotes more time than Dr. Romy to diagnosing back problems and that she routinely performs the same type of task requested of her here far more often than Dr. Romy. We infer from his description of his current practice that he devotes the majority of his time to surgery and is called upon far less frequently to make an initial diagnosis on a patient presenting with an unidentified back problem.

In conclusion, although the causation issue is a close question, we resolve it in defendant's favor for the reasons discussed. Both parties have presented plausible theories of causation, but we must in the final analysis find for the defendant on this issue. The plaintiff bears the burden

---

**29.** Dr. Romy testified, in response to further questioning from defendant's counsel:

Q. Starting with the point the MRI was taken, at that point in time, that confirmed a herniated disc; is that correct?
A. That's correct.
Q. Were there any reports or any other observations prior to that time which suggested disc herniation?
A. Of course. This is why the MRI was requested.
Q. Okay. What were those signs.

A. You will have to go back to that report of Dr. Tuffaha. There were stiffness of the back. There was radicular symptoms. There were sufficient clinical evidence to suggest a disc, so the MRI was requested.
(Transcript of videotape deposition, trial exhibit P-34, pp. 92–93)

**30.** See transcript of videotape deposition of Dr. Romy, trial exhibit P-34, pp. 33–34.

**31.** See note 11 *supra* for a description of what occurs when a disc herniates.

of proof, and we have not been persuaded in this case that plaintiff has proven by a preponderance of the evidence that his theory is the correct one.

*Conclusions of law*

For the reasons discussed above, we make the following conclusions of law:

1. Under the Federal Tort Claims Act, this action is governed by Pennsylvania law, the state where the accident occurred.

2. Under Pennsylvania law, the Postal Service had a duty to the plaintiff to ensure that the brakes on APC's loaded onto his trailer were in proper working order or if that was not the case to follow red-tagging regulations to alert plaintiff of the defect.

3. Defendant breached the duty owed to plaintiff.

4. Postal Service employees or agents were negligent in failing either to red tag because of a defective brake or to set the brake on the APC which struck plaintiff.

5. Plaintiff was not contributorily negligent.

6. Plaintiff suffered a lumbosacral sprain or strain as a proximate result of the February 6, 1988 accident with the APC.

7. Plaintiff failed to prove, by a preponderance of the evidence, that the February 6, 1988 accident with the APC was a substantial factor in causing him to suffer (1) a herniated disc, (2) any back injury other than a lumbosacral sprain, or (3) the worsening of his psoriasis condition.

8. Plaintiff proved that he sustained lost wages of $3,303.08 as a proximate result of the February 6, 1988 accident with the APC.

9. Plaintiff proved that he incurred medical expenses of $3,042.35 as a proximate result of the February 6, 1988 accident with the APC.

10. Plaintiff is entitled to recover $2,500.00 as compensation for pain and suffering which was the proximate result of the February 6, 1988 accident with the APC.

11. Plaintiff is entitled to recover total damages of $8,845.43 from the United States for harm caused by the February 6, 1988 accident with the APC.

\* \* \*

Appendix A

Medical Expenses incurred for treatment of lumbosacral sprain: [32]

| Invoice Date | Service Provider | Amount | Dates of Services |
| --- | --- | --- | --- |
| 3/16/88 | Dr. Miller | $ 195.00 | 2/11/88 to 3/01/88 |
| 3/16/88 | Jersey Shore Hospital | 75.00 | 2/11/88 |
| 3/16/88 | Divine Providence Hospital | 577.65 | 2/14/88 to 2/19/88 |
| 3/16/88 | Divine Providence Medical Group | 211.50 | 2/14/88 to 3/01/88 |
| 4/18/88 | Dr. Miller | 255.00 | 3/30/88 to 3/17/88 |
| 4/18/88 | Lycoming Radiology Assc. | 26.00 | 2/14/88 |
| 4/18/88 | Divine Providence Hospital | 535.70 | 2/16/88, 2/22/88, 2/29/88 |
| 7/21/88 | Divine Providence Hospital | 1320.70 | 2/11/88 to 4/05/88 |
| 7/21/88 | Richard Millard | 44.70 | 2/16/88 to 4/12/88 |
| 8/25/88 | Emergency Room at Divine Providence | 76.50 | 2/14/88 to 2/19/88 |

| Invoice Date | Service Provider | Amount | Dates of Services |
|---|---|---|---|
| 11/21/88 | Divine Providence Medical Group | 135.00 | 3/08/88 to 3/17/88 |
| **TOTAL** | | **$3,042.35** | |

[32] The list includes all medical expenses incurred by plaintiff prior to March 17, 1988, the date when he had recovered, or substantially recovered from lumbosacral sprain and began to incur expenses for the herniated disc for which the defendant is not responsible.

The record does not include any bills or invoices from the care providers, making it impossible for the court to break down expenses with greater precision. The only information the court had before it in preparing this list was a summary of medical expenses prepared by plaintiff, or at his request (Trial exhibit P–30). As a result, the breakdown was done solely on the basis of the date the service was rendered, even though this result in the inclusion of certain bills, (See, e.g. the entry for bill from Divine Providence Hospital dated 7/21/88.), the full amount of which defendant may not be responsible for under the findings and conclusions of this court.